FILED & JUDGMENT ENTERED
Steven T. Salata

Feb 06 2013

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

J. Craig Whitley
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### Charlotte Division

| | | |
|---|---|---|
| In re: | ) | |
| | ) | **Case No. 11-32050** |
| **RTJJ, INC.,** | ) | |
| | ) | **Chapter 11** |
| Debtor. | ) | |
| | ) | |

## ORDER

**THIS MATTER** is before the Court upon:

(1) Confirmation of the Debtor's Second Amended Plan Of Reorganization and the objection filed by Community One Bank, N.A. ("Community One"), thereto;

(2) Community One's Objection to Ballots and Balloting Report;

(3) the Debtor's Amended Motion to Allow Late-Filed Ballots; and

(4) Community One's Motion for Relief from the Automatic Stay (the "Stay Relief Motion") and the Debtor's Response thereto (collectively the "Motions").

Hearings were held on October 29-30, 2012. James H. Henderson appeared for RTJJ; Douglas R. Ghidina and Caroline H. Yingling represented Community One.

Holding: For the reasons stated below, the Debtor's Second Amended Plan as revised at hearing is **CONFIRMED**; Community One's Objection to Ballots and Balloting Report is **PARTIALLY SUSTAINED** and **PARTIALLY OVERRULED**; the Debtor's Amended Motion To Allow Late-Filed Ballots is **PARTIALLY ALLOWED** and **PARTIALLY DENIED**; and Community One's Stay Relief Motion is **DENIED**.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. <u>Pre-Bankruptcy</u>

The Debtor is a small family business, which owns sixty-two (62) rental houses, apartments and undeveloped residential building lots in Gastonia, North Carolina. Most of these are former single-family residences, colloquially "mill houses." More recently, these homes have been subdivided for rental as individual apartments. Thus, a single dwelling may be rented to multiple tenants.  RTJJ's business is unique in the local market not just for this, but also because it rents furnished apartments on a weekly rental basis.

The family patriarch, Harrill Jones, started RTJJ's predecessor businesses (Harrill Jones, Inc. and Excelsior Group, Inc.) in the 1960's. Jones' businesses prospered and for years, the companies had a waiting list of tenants. These companies catered to textile worker tenants. In 1997, sons Rick, Todd, and Jeffrey Jones incorporated RTJJ and purchased many of the Properties from these predecessor companies.

Between 2000 and 2004, many Gaston County mills closed. The closings adversely affected the local economy and left one-third of the Jones' companies' rental units vacant. Meanwhile, Harrill Jones suffered other business and investment reversals. In 2005, Harrill Jones took his own life.

This unfortunate sequence of events left the Jones family businesses in a tough spot. Rick Jones, RTJJ's President, says his father's death left the businesses with $3,500,000 million in insurance proceeds but over $7,000,000 in debt, including a $650,000 federal tax debt.

In 2006, RTJJ purchased the remaining properties owned by Harrill Jones, Inc. and Excelsior Group, Inc. Community One financed these purchases as well as the company's tax debt.

Community One's debts exist under four notes and three separate deeds of trust, which give it a perfected mortgage debt on all but one of RTJJ's real properties. (Community One's collateral is the "Properties.")  Creditor First National Bank of Shelby ("First National") holds a mortgage on that one other rental house. From what can be surmised, there never was much equity in the Properties over Community One's loan balance, if any.  It may be that the Properties were over encumbered from the outset. Either way, Community One's secured position suffered dramatic erosion after the 2007 housing bubble bust and national real estate values plummeted.

Between these events and its then high vacancy rate, RTJJ was unable to make its monthly mortgage payments. It succeeded in obtaining a twelve month forbearance agreement from Community One. RTJJ used this time to remodel its properties, redirect its business, and attempt to return to profitability. Recognizing that the market for apartment rentals had changed, RTJJ converted a number of its one bedroom apartments into larger two bedroom apartments. This change improved the company's occupancy rate; however, RTJJ was still unable to make its full mortgage payments.

Community One then instituted foreclosure proceedings against the Properties. To stop the sale, on August 8, 2011, RTJJ filed Chapter 11.

According to its Schedules, RTJJ owed secured debt of $3,918,967.20 at the filing date, no priority debt, and $43,191.71 of general unsecured debt. The claims docket as of October 27, 2011 summarizes filed claims as follows: $2,534,209.02 secured; $453.67

priority; and $57,189.48 general unsecured. These differences are not material for present purposes.

### B. **The Chapter 11 Period**

Since bankruptcy, RTJJ has continued to operate the Properties under an agreed cash collateral order with Community One.  The Debtor's post petition operations have been quite successful.  RTJJ's occupancy rate has increased from sixty-seven percent (67%) to ninety-five percent (95%), and has remained there for the past year. Effectively, the Properties are fully rented. RTJJ has made all of the agreed adequate protection payments to Community One. By October 2012, RTJJ's 2012 cash flow had exceeded 2011 levels with two months of the year to spare. The Debtor is showing an operating profit, albeit before debt service.

All concerned agree that RTJJ is a well-run company. From the two appraisers who testified at an earlier valuation hearing, to the Gastonia City manager, all agree that RTJJ has a very good reputation, is well run, and is compliant with applicable housing requirements. It is also undisputed that as the only area business of its sort, RTJJ serves a vital need in the Gastonia low-income housing market. Because RTJJ's Properties are located in fragile, poor neighborhoods, Gastonia believes that loss of this business would have a negative effect on the community, both in loss of low-income housing and the prospect of increased crime.

Unfortunately, even at full occupancy levels, the Properties do not generate sufficient revenues to service the mortgage debt of Community One and First National. Thus, reorganization is dependent on RTJJ being able to  "smooth down" its secured debt to a level that the Properties can support. With First National, doing so has been

relatively easy. RTJJ and First National agree that its single collateral property has a value (and therefore a secured claim) of $17,500, and an unsecured 'deficiency' of about $7,500. The two sides have agreed on the treatment of these claims in a plan.

The Community One situation is much more contentious. In its Schedules, RTJJ originally valued Community One's collateral at $864,710.00. However, Community One has maintained throughout the case that its collateral was worth more than its $2,453,838.88 debt. The proper valuation of the Properties and thus, Community One's secured claim has been the crucial issue in the case.

When RTJJ filed its original plan and disclosure Statement on January 18, 2012, it proposed to value Community One's collateral per 11 U.S.C §506(a) and bifurcate the debt between its secured and unsecured portions. The secured claim was to be re-amortized and paid in installments as a long term secured claim. The unsecured claim would be treated with other unsecured claims and receive a small dividend. The accompanying Disclosure Statement was approved on March 1, 2012 and the Plan was circulated for balloting on March 13, 2012. A balloting response deadline was set for April 3, 2012. However, Community One was the only creditor to file a timely ballot. It rejected the plan and further filed an objection to confirmation.

By agreement, confirmation was then delayed in order to have the Properties appraised. A valuation hearing was held on July 9, 2012. The Properties were ascribed a fair market value of $1,471,350. Order Valuing Collateral, Sept. 25, 2012, ECF No. 97. Per 11 U.S.C §506(a), Community One holds a secured claim of the same amount. Its remaining $982,487.00 debt is an unsecured claim.

Disappointed about not being treated as fully secured, Community One then sought relief from stay to foreclose on its collateral. Mot. for Relief from Stay, Sept. 7, 2012, ECF No. 84. It also objected to two late-filed unsecured ballots that accepted the original plan, those of Simonds Sanitation ("Simonds") (Ballot filed April 11, 2012; claim of $700) and First National (Ballot filed August 6, 2012; claim of $17,500). Mot. Objecting to Ballots and Balloting Report, Sept. 14, 2012, ECF No. 85. It later objected to RTJJ's Balloting Report, which counted these tardy ballots for confirmation purposes.

RTJJ replied with its motion seeking allowance of the two ballots (ECF No. 91) and tweaked its Original Plan with amendments filed September 21, 2012 (the "First Amended Plan") (ECF No. 96) and October 16, 2012 (the "Second Amended Plan")[1] (ECF No. 107).

### C. The Second Amended Plan

The Second Amended Plan[2] contemplates that RTJJ will continue to operate its business and fund plan payments through future revenues.

Community One's $1,471,350 secured claim (Class 1) is to be repaid with interest at five percent per annum, in monthly installments of $8,599.32 under a twenty-five year amortization schedule and with a seven year call. As filed, the Second Amended Plan proposes to surrender three of the Properties in a "dirt for debt" provision. However, Community One objected to this treatment, and at the confirmation hearing, RTJJ withdrew this proposal. RTJJ currently proposes to retain all of the Properties and pay the full secured portion of the claims as above.

---

[1] Since the First Amended Plan has been eclipsed, we will not discuss its terms.

[2] As filed. Further verbal amendments were proposed at the confirmation hearing and are separately noted.

Meanwhile, Community One's $982,487 unsecured claim is treated in Class 4, together with the claims of Harill Jones, Inc., Patty M. Jones, and the Exclesior Group. Each is the unsecured portion of a mortgage claim. As filed, the Second Amended Plan proposes to give Class 4 claimants nonvoting Class B stock in satisfaction of their unsecured claims. Community One objected to this treatment, suggesting that the Class B stock is worthless and noting that 11 U.S.C. §1123(a)(6) prohibits a reorganized debtor from issuing nonvoting stock. Again seeking to appease its lender, at the confirmation hearing RTJJ amended the Class 4 treatment to give Community One an immediate $50,000 cash payment in satisfaction of its Class 4 claim. All other class members (all are insiders) agreed to waive a distribution on their Class 4 claims.

Regarding First National, the $17,500 secured portion of its mortgage claim (Class 2) is to be paid in monthly installments with 4.25% interest, a twenty year amortization period and a five year call date. The remaining $7,500 balance of First National's debt is to be treated as a Class 5 unsecured claim.

All other unsecured claims are treated in Class 5. These holders are to receive two percent of their allowed claims payable over five years in equal annual installments, without interest.

RTJJ's outstanding stock will be cancelled. The Jones brothers will contribute $20,000 to the reorganized Debtor in exchange for new Class A Common Stock. Class A Common Stock is to receive no interest, dividends, or any other distributions while Community One's Class 1 secured claim is outstanding (and as filed, while the Class B Common Stock is outstanding). The Plan alternatively proposed to auction the Class A

Common Stock at the confirmation hearing. Given the hearing amendment to Class 4 noted above, the stock restriction is no longer applicable.

### D. The Confirmation Objection

Community One has objected to confirmation of each iteration of the Plan, including the verbal amendments offered at hearing. It argues the following: (1) classifying its unsecured claim separate from the Class 5 unsecured claims constitutes unfair gerrymandering; (2) no impaired class has accepted the Second Amended Plan as required by 11 U.S.C. §1129(a)(10); (3) this plan is not fair and equitable under 11 U.S.C. §1129(a)(B)(ii)(a) because the interest rate to be paid on its Class 1 secured claim is too low; and (4) this plan is not fair and equitable as to its Class 4 unsecured claim because it violates the absolute priority rule. Specifically, Community One objects to the Jones brothers receiving the new Class A stock and argues that their $20,000 payment does not constitute "new value" under §1129(a)(B)(ii)(a).[3]

By contrast, the other two balloting, non-insider creditors, First National and Simonds, are satisfied with the Debtor's plan. They believe that their treatment under the Second Amended Plan (revised) while modest, is superior to what they could expect in either liquidation or foreclosure.

In this, they are correct. All of RTJJ's assets are subject to the liens of Community One, First National, or the subordinate mortgages of the other Class 4 creditors. Even at fair market values, these rental properties are upside down at least

---

[3] Community One's other argument, that the partial "dirt for debt" conveyance of three parcels does not constitute the "indubitable equivalent" of its secured claim need not be addressed given that RTJJ has since withdrawn that proposal.

$2,500,000. (Fair market value of $1,470,000 as compared to mortgage debt of $3,918,967.00).

The two first priority lenders, Community One and First National, are greatly undersecured, even at fair market values. However, in a forced liquidation or foreclosure, the Properties would fetch far less than fair market value. The RTJJ houses are unique assets. Generally, they are old houses. Most have been extensively remodeled such that a single house typically contains multiple apartments. Because of this, these houses could not be resold for use as single-family residences without substantial modifications. Further, they are unlikely to be sold "as is" for use by other landlords. There are no other landlords in the Gastonia market who operate similar businesses (furnished units, multiple units per house, weekly rentals). The real estate market is weak. Because there are so many of these rental properties and the market is so small (population of Gastonia, N.C. is only 70,000), a forced sale of the Properties would flood the low-income real estate market and further depress already depressed values. In a Chapter 7 liquidation or foreclosure, the seller of the Properties would take an unbelievable "bath."

Meanwhile, RTJJ also owes administrative expenses of at least $45,313.00. Order Awarding Compensation to Att'y James H. Henderson, Dec. 28, 2012, ECF No. 116. Hypothetical Chapter 7 administrative expenses would run at least this much,[4] even assuming that the lenders would consent to a short sale. In sum, in a liquidation or foreclosure, there will be no distribution to unsecured creditors. Secured creditors would recover much less than the secured portion of their claims.

---

[4] Trustee commissions would also be at least three percent of any sales proceeds. *See* 11 U.S.C. §326(a).

Notwithstanding the obvious deleterious effects of a foreclosure, unless RTJJ can pay its entire $2.5 million debt, Community One wants to pursue this course. Its motivation appears to have little to do with RTJJ or the merits of the Second Amended Plan (rev.)

Like many community banks that before the real estate crash had made too many real estate and development loans, Community One has had its own problems of late. At the confirmation hearing, RTJJ introduced several pieces of evidence bearing on the bank's woes. Among this evidence, as of March 31, 2011, the Bank was categorized as "critically undercapitalized." and was almost closed by the Office of the Controller of the Currency ("OCC"). It, a sister bank, and their holding company have been operating under OCC supervision for some time. Given this, and because Community One's demands are alternatively unrealistic (the demand to be paid as a fully secured creditor per the original loan terms), or self destructive (the request to foreclose), RTJJ believes that the Bank's actions are based on regulatory pressures and not on the merits of the Plan. On this record, it appears that RTJJ is correct.

## CONCLUSIONS OF LAW

**A.  The Late-filed Ballot of Simonds is Allowed for Voting Purposes Under the Excusable Neglect Standard; the Ballot of First National is not Allowed.**

Turning to the matter of the late filed ballots, Community One argues that the First National and Simonds ballots should be disregarded under Bankruptcy Rule 3018. RTJJ disagrees, arguing that these creditors' tardiness falls under the "excusable neglect" doctrine.

In *Pioneer Inv. Servs. Co. v. Brunswick Assoc. Ltd. P'ship*, the United States Supreme Court described the concept of "excusable neglect" as it applies in bankruptcy. 507 US 380, 388-95 (1993). The Court stated:

> Hence, by empowering the courts to accept late filings "where the failure to act was the result of excusable neglect," Rule 9006(b)(1), Congress plainly contemplated that the courts would be permitted, where appropriate, to accept late filings caused by inadvertence, mistake, or carelessness, as well as by intervening circumstances beyond the party's control.

*Id.* at 388.

One claiming excusable neglect must demonstrate its existence and defend its own conduct. See *McCain v. Educ. Credit Mgmt. Corp.* (*In re McCain*), 353 B.R. 452, 461 (Bankr. E.D. Va. 2006). Excusable neglect has two components: (1) the delay in filing must be due to "neglect," which includes "inadvertence, mistake, or carelessness," and (2) the neglect must be "excusable." *In re SPR Corp.*, 45 F.3d 70, 72 (4th Cir. 1995).

The Fourth Circuit has explained:

> The excusability determination is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission. These circumstances include the danger of prejudice to the debtor [or non-movant], the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith.

*Id.* (*quoting Pioneer Inv. Servs. Co.*, 507 U.S. at 395) (internal citations and formatting omitted).

Applying these principles to the present facts, it appears that the late-filed ballot of First National is not the product of excusable neglect. The Plan, Disclosure Statement and ballot were received by First National and then referred to an in-house attorney for action. Inexplicably, bank counsel concluded that its ballot was not due until <u>after</u> plan

confirmation. In fact, First National would not have balloted at all had RTJJ not hand delivered it a ballot shortly before the continued confirmation hearing. The First National ballot was signed and filed on August 3, 2012, four months after the balloting deadline.

Where the reason for delay or untimely action is within the claimant's control and ordinary negligence explains the creditor's failure to timely file its pleading after adequate notice of the deadline, a bankruptcy court should not excuse the late filing. *See In re Rose's Stores, Inc.*, 165 B.R. 410, 412 (Bankr. E.D.N.C. 1994).

In particular, errors committed by a party's counsel do not constitute excusable neglect. "[T]he client is held accountable for mistakes or omission of counsel" and counsel's "inadvertence, ignorance of the rules, or mistakes construing the rules do not usually constitute excusable neglect." *In re Roasters Corp.,* 2000 Bankr. LEXIS 1916, at *10 (Bankr. M.D.N.C. March 14, 2000); *see also In re Tubular Technologies, LLC*, 348 B.R. 699, 712 (Bankr. D.S.C. 2006); *Belcher v. Columbia Univ.* (*In re Belcher*), 293 B.R. 265, 268 (Bankr. N.D. Ga. 2001).

First National's failure to file its ballot in timely fashion was entirely due to attorney error. Further, the length of delay was material. This creditor missed the deadline by a period of months with the ballot not being returned until the eve of the confirmation hearing.[5] The First National ballot will be excluded.

In contrast, the late-filed ballot of Simonds Sanitation was the product of excusable neglect. This ballot was filed on April 11, 2012, or six business days after the balloting deadline. Simonds is a small trash hauling service. RTJJ is one of its best and largest customers. Simonds received the Plan, Disclosure Statement, and ballot sometime

---

[5] At the balloting date, the confirmation hearing was scheduled three weeks later, or August 28, 2012.

after March 12, 2012, the date these items were mailed to creditors. Unfamiliar with bankruptcy, on receipt, Ashley Simonds mailed these documents to her attorney to seek an explanation. Ms. Simonds spoke to counsel on March 28, 2012. She was advised to mark "Accept" on the ballot, sign it and return it. She clearly recalled doing so that same day. Simonds has no idea why her company's ballot was not received until April 11.

There is no prejudice to other parties in allowing this ballot. Simonds' debt was listed in RTJJ's schedules and no one contests the liability. The balloting delay was short, being just a matter of days. Since the confirmation hearing was not held for another five months, the ballot's tardiness had no effect on this case.

Clearly, Simonds is acting in good faith. It wishes to cast its vote in favor of reorganization so that it may collect a small part of its debt and, more importantly, keep a customer. And its actions were reasonable. As a layperson, Ms. Simonds sought an explanation from counsel about the meaning of these documents.

Community One would deem Simonds' tardiness the product of attorney error. However, the evidence does not support such a conclusion. Ms. Simonds' undisputed testimony has her talking to counsel and mailing the ballot more than a week before the deadline. No one knows why the ballot was late, but it doesn't appear to be the product of attorney error. Nor does it appear to be due to creditor inaction.

While disallowing the Simonds claim would serve no meritorious purpose, the opposite is not true. Disallowing this ballot would end the confirmation inquiry and end in a foreclosure. Between the §1129(a)(10) requirement that there be one accepting, impaired class and because there are so few creditors eligible to ballot, disallowing the ballot would be tantamount to denial of confirmation, which in turn would force a

foreclosure. Given the stakes and the circumstances, this Court's equitable discretion will be exercised in favor of allowing the Simonds claim for balloting.

Thus, the Debtor's Amended Motion To Allow Late-Filed Ballots is **Granted** as to Simonds, but **Denied** as to First National; inversely, Community One's Objection to the ballot of First National is **Sustained**; but as to Simonds is **Overruled**.

### B.   The Debtor's Proposed Plan of Reorganization is Confirmed.

Turning to the question of confirmation under 11 U.S.C. §1129, RTJJ, as plan proponent, has the burden of demonstrating that its plan meets the statutory requirements. *In re Locke Mill Partners*, 178 B.R. 697, 700 (Bankr. M.D.N.C. 1995). Most of these are not in dispute. Only the disputed elements need be addressed.

### 1.   Classification of Community One's unsecured claim separately from other unsecured claims is not improper.

Community One argues that classifying the undersecured portion of its debt in Class 4 and separately from the Class 5 unsecured claims (particularly that of First National is unfair gerrymandering prohibited by 11 U.S.C. §1122, §1129(a)(2), §1129(a)(3), and §1129(a)(10). This Court disagrees.

There are inherent differences between an undersecured mortgage claim and other unsecured claims. *See In re Deep River Warehouse, Inc.*, 2005 Bankr. LEXIS 1793, at *12 (Bankr. M.D.N.C. Sept. 22, 2005). "The rights afforded to holders of deficiency claims are simply greater [than] (and therefore different from) the rights given to other unsecured creditors." *Id.*, (*citing In re SM 104 Ltd.*, 160 B.R. 202, 219-20 (Bankr. S.D. Fla. 1993)).

Here, Community One has a mortgage on substantially all of the Debtor's assets (the Properties), plus an assignment of rents and personal guaranties from RTJJ's owners. Save for First National, the Class 5 claims are unsecured trade debt.

Obviously, Community One has more options than trade creditors. It could seek recovery through a reorganization Plan (either as a bifurcated creditor or as a secured creditor under §1111(b)), by foreclosure of its collateral, and/or by pursuing the guarantors. Only the first option is available to trade creditors.

Admittedly, there are similarities between Community One's claims and those of First National, which has been placed in Class 5. Both are institutional lenders with long term, undersecured mortgage debts. Even so, there are also substantial differences between the two. Community One is a dominant secured creditor whereas First National has a single mortgage claim. RTJJ could survive the loss of First National's collateral. The loss of Community One's collateral would be fatal.

Moreover, at $982,487, Community One's unsecured claim dwarfs the general unsecured claims of $64,689.48, inclusive of First National's $7,500 unsecured claim. Placing Community One's claim in the same class as these creditors would give Community One hegemony over the unsecured creditor vote and the ability to block confirmation of any plan. This potential hegemony is of concern, not just because Community One is primarily a secured creditor, but also because Community One's all or nothing attitude towards a reorganization plan. As noted above, full payment is impossible and foreclosure would be a disaster for all. Because it appears that Community One's opposition to reorganization has little to do with the merits of RTJJ's Plan or its non-bankruptcy recovery prospects, but instead is based upon a desire to

simply remove a nonperforming loan from its books, the lender's motivation and goals are diametrically opposed to other unsecured creditors.

11 U.S.C. §1122 does not otherwise prohibit separate classification of similar claims, if there is a legitimate basis for doing so. *See In re Grandfather Mountain Ltd. P'ship*, 207 B.R. 475, 483 (Bankr. M.D.N.C. 1996).

Because Community One is primarily a secured creditor with liens on substantially all estate assets, given the overwhelming size of its unsecured deficiency claim relative to those of other unsecured creditors, and because Community One's goals are diametrically opposed to other creditors, it is appropriate to separately classify it from these other unsecured creditors.

Community One also argues that in separately classifying its unsecured claim from other unsecured debt, RTJJ is attempting to subordinate its deficiency claim to the Class 5 claims. In the Second Amended Plan, as filed, RTJJ proposed giving the Class 5 unsecured creditors cash distributions totaling two percent (2%) of their claims whereas Community One would receive the Class B stock. Since that stock receives no distributions and is to be cancelled at the end of the Plan term, Community One rightly argues that it could receive nothing on account of its Class 4 claim. Thus, the treatment of its unsecured claim is not substantially equivalent to that of other non-insider unsecured creditors. Further, Community One is correct in its assertion that issuance of nonvoting stock by a reorganized debtor is prohibited by 11 U.S.C §1123(a)(6).

However, this disparate result appears to be an unintended consequence of RTJJ's attempts to placate the Bank. RTJJ's original plan had Community One in Class 5 with other unsecured creditors. When the Bank objected to the two percent (2%) distribution

proposed to that class as being paltry, RTJJ amended its plan, moved Community One to Class 4 and offered it Class B stock. According to Debtor's counsel, that stock was intended to provide Community One a liquidation preference. Should the Properties appreciate and be sold or refinanced over the Plan term, the Class B stock was to receive a part of that appreciation. That proposal was not acceptable to Community One.

However, these two deficiencies are not fatal, given RTJJ's offer at the confirmation hearing to withdraw the Class B stock and to pay Community One a $50,000 cash distribution on the effective date. This would pay Community One five percent (5%) of its Class 4 claims, meaning more than the Class 5 unsecured creditors. Meanwhile, the other Class 4 creditors have offered to waive any distribution on their Class 4 claims. This amendment eliminates both the nonvoting stock problem and the classification disparity.

### 2. Class 4, an impaired class has voted to accept the Amended Plan, as required by 11 U.S.C. §1129(a)(10).

Community One also argues that one impaired, non-insider class has not accepted the Plan as required by §1129(a)(10). Because the Simonds claim has been allowed for balloting, that is no longer true. The requirement of 11 U.S.C. §1129(a)(10) is satisfied. However, given Community One's votes, Classes 1 and 4 have not accepted the Second Amended Plan. RTJJ must attempt to cram down under 11 U.S.C. §1129(b).

### 3. The Second Amended Plan is fair and equitable to Community One as a secured creditor under 11 U.S.C. §1129(b)(2)(A).

Community One suggests that the Plan is not fair and equitable as to it as a secured claim, because (1) RTJJ's proposal to return a portion of its collateral for a partial

write down of its secured claim is not the "indubitable equivalent of its secured debt and (2) the proposed interest rate on the remainder of that secured claim is unreasonably low.

At the confirmation hearing, RTJJ withdrew its proposal to return three parcels to Community One in partial satisfaction of its secured claim, thereby mooting Community One's "dirt for debt" objection.

As to the interest rate to be paid on Community One's Class 1 secured claim, this appears to be a rate that adequately compensates Community One for the risks attendant to the restructured loan per §1129(b)(2)(A)(i)(II) and is consistent with Supreme Court precedent.

Given the limited evidence presented at hearing by either side, the choice of interest rates is challenging. RTJJ has proposed a five percent (5%) rate, based upon a twenty-five year amortization period and a seven year call. There is no particular magic to RTJJ's choice of interest rates. Debtor's counsel chose this rate based upon a review of recent published case decisions discussing interest rates in Chapter 11. Debtor's counsel then compared this rate to the 4.25% rate, which First National agreed to accept on its secured claim.

By comparison, Community One's contention that the rate is too low was founded upon its loan officer's testimony that there is no applicable interest rate, given that the bank does not make any loans on non-owner-occupied properties where the amortization period exceeds fifteen years.

Of course, what Community One is willing to do at this point in time isn't the question.

At one point, some bankruptcy courts were requiring Debtors to offer secured creditor repayment terms equivalent to those mandated if the lender were making an entirely new loan. *See Till v. SCS Credit Corp.*, 541 U.S. 465, 472 (2004). However, in *Till*, the Supreme Court rejected this "coerced loan" approach in favor of an interest rate based upon the prime rate, augmented by a risk adjustment, typically one percent (1%) to three percent (3%), to compensate the lender for its risk. *Id.* at 480.

While *Till* was a Chapter 13 case decided under 11 U.S.C §1325(a)(5)(B)(ii), §1129(b)(2)(A)(i)(II) employs identical language. Additionally, in *Till*, the Supreme Court indicated that this method of determining interest rates should be employed in all types of bankruptcy cases: "[W]e think it likely that Congress intended bankruptcy judges and trustees to follow essentially the same approach when choosing an appropriate interest rate under any of these provisions." *Id.* at 474. The only possible exception to this rule would be that if there is an efficient market for financing loans to Chapter 11 debtors, and that if such a market were available to the debtor, it would be appropriate to consider what rate such an efficient market would dictate. *Id.* at 477 n.14.  No one has suggested that the efficient market exception is applicable to our case. Therefore, we will employ *Till's* general rule.

The evidence presented at the confirmation hearing established the prime rate of interest to be 3.25%. To this, RTJJ has offered an upward adjustment of 1.75% as a risk premium. This risk premium falls within the one to three percent (1% - 3%) range discussed in *Till*.

Under *Till*, the only risk factors to be considered are (1) the state of financial markets, the (2) circumstances of the bankruptcy estate, and (3) the particular

characteristics of the loan (i.e., whether it is secured or unsecured, its nature, term, interest rate, payment amounts and amortization schedule). *Id.* at 466.

These factors weigh in favor of the interest rate offered by RTJJ. Community One's collateral is well maintained. Because the Debtor self performs the work, property maintenance is provided in a cost effective manner. Given this, the fact that the Properties as a group are older, and the fact that the local real estate market has stabilized, the Properties are unlikely to depreciate.

The risk of nonpayment is low. RTJJ and its predecessor businesses have been in this business for decades. Management is competent, experienced and motivated. The properties are almost entirely occupied. The Debtor is cash flowing and with a value-based secured debt level, it has the ability to make the proposed installment payments. As the adequate protection payments made during the post-petition period demonstrate, RTJJ is willing to pay its creditors. The bankruptcy case was not occasioned by fraud or mismanagement, but macroeconomic factors (demise of American textiles, the real estate collapse and the worldwide recession) beyond RTJJ's control. These events are unlikely to recur.

Given these favorable factual circumstances the 1.75% risk augmentation is reasonable, particularly since the loan call date is only seven years away. This loan period is sufficient for the economy and property values to recover to make a sale of refinance possible but not so long as to unduly increase Community One's risk of repayment.

**4. The Second Amended Plan is fair and equitable to Community One as an unsecured creditor, and given the new value to be contributed by the shareholders, does not violate the absolute priority rule of 11 U.S.C. §1129(b)(2)(B)(ii).**

11 U.S.C §1129(b)(2) sets forth criteria that must be met in order for a plan to be considered fair and equitable as to a dissenting class of unsecured claims. Specifically, §1129(b)(2)(B) requires that the plan satisfy the "absolute priority rule." Under this rule, either (i) the plan must provide for payment in full of the allowed amount of the unsecured claims in the dissenting class, or (ii) the holder of any claim or interest junior to the dissenting class (i.e., equity owners in the debtor) may not receive or retain property on account of such claim or interest.

Clearly, control of a business and the right to future distributions based upon stock ownership are "property" under §1129(b)(2)(B)(ii). *See Bank of America Nat'l Trust and Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 455 (1999); *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 208 (1988); *N. Pac. Ry. Co. v. Boyd*, 228 U.S. 482, 508 (1913).

Community One argues that the Second Amended Plan is not fair and equitable to it as an unsecured creditor under §1129(b)(2)(B)(ii) because the Jones brothers, the existing shareholders, are afforded the exclusive right to purchase stock in the reorganized Debtor and to receive future distributions, based upon the newly issued Class A Common Stock.

RTJJ counters that the stock purchase proposal falls within the "new value exception" to the absolute priority rule. Under the new value exception, equity may retain

an interest in a reorganized debtor over the objection of a class of creditors whose claims are not paid in full, in exchange for a fresh contribution of new capital. *See In re Bonner Mall P'ship*, 2 F.3d 899, 909 (9th Cir. 1993); *Grandfather Mtn. Limited P'ship*, 207 B.R. at 492. A plan that meets the new value exception does not violate §1129(b)(2)(B)(ii) because it does "not give old equity property 'on account of' prior interests, but instead will allow the former owners to participate in the reorganized debtor on account of a substantial, necessary, and fair new value contribution." *In re Bonner*, 23 F.3d at 909.

The five requirements of 'new value' are that it be "1) new, 2) substantial, 3) money or money's worth, 4) necessary for a successful reorganization and 5) reasonably equivalent to the value or interest received." *Id.*

In this case, the first and third requirements are not in dispute. The $20,000 that the Jones brothers are borrowing to contribute to RTJJ is undoubtedly new money.

However, Community One argues that the shareholders' contribution is not necessary, substantial, or reasonably equivalent to the equity interest in the reorganized debtor that the Shareholders are to receive. It points out that $20,000 is only two percent (2%) of its $982,487 unsecured claim. Community One also maintains that the contribution is grossly disproportionate to the value of the assets the reorganized debtor is to retain, which value, Community One characterizes as $1.5 million. Given the small dollar amount of the equity contribution, Community One suggests that it is not necessary. After all, the Debtor has other banked funds. Finally, the Bank suggests that the equity contribution has not been market tested.

On the facts presented, this Court disagrees. The equity contribution serves a necessary function in this particular case: this contribution is the only available funding

available to pay administrative expenses, specifically RTJJ's attorneys fees. The Debtor is in a bit of quandary here. Payment of administrative expenses is required under §1129(a)(9) as a condition of confirmation. While the Debtor has some bank deposits, much of this is necessary to operations. Further, these monies derive from rents. Community One holds an assignment of rents on the Properties. Under 11 U.S.C. §552(b)(2), post petition rents serve as additional collateral for Community One's mortgage debt. Absent consent, a debtor cannot fund its attorney's fees from an undersecured creditor's collateral. *In re 680 Fifth Ave. Assocs.*, 154 B.R. 38, 43 (Bankr. S.D.N.Y. 1993). Community One opposes RTJJ's reorganization attempt and has not consented to RTJJ using rents to pay Mr. Henderson's fees. The $20,000 is certainly necessary.

Similarly, the contribution is substantial. Substantiality is the most controversial aspect of the new value exception, with courts struggling to define the term and commentators suggesting that it is unnecessary. 7 *Collier on Bankruptcy* ¶1129.03[4][c] (16th ed. 2012). All agree that the payment cannot be token or nominal but beyond this there is no consensus. As Community One suggests, some courts have measured substantiality by comparison to the total amount of unsecured claims. However, other courts warn against employing such mechanical tests. *Id.* at ¶1129.03[4][c], n.282. Collier's criticizes this approach as not be required by case precedent and also because it is unnecessary. *Id.* at ¶1129.03[4][c].

Here, the equity contribution is admittedly small as compared to outstanding unsecured debt. However, even at this level, this $20,000 infusion is significant to a small family business, bereft of unencumbered assets, and generally limited in its cash

resources. This Debtor has only $36,000 of bank deposits, after tenant deposits and the $50,000 payment to be made on Community One 's Class 4 claim. As compared to net available cash, $20,000 is significant. The proposed stock payment will satisfy administrative expense claims.[6]

This sum is also significant from the shareholders' perspective. The absolute priority rule dates back to railroad reorganizations of yesteryear. It was formulated to prevent bond and stockholders using bankruptcy to squeeze out intermediate unsecured debt. *See N. Pac. Ry. Co. v. Boyd*, 228 U.S. 482, 506-08 (1913). That is of course an appropriate restatement of the non-bankruptcy rule that creditors are paid before equity. However, there are no coupon clippers in this case. The Jones brothers are working people of modest means. For them, $20,000 is a sizeable sum; in fact, they will have to borrow to fund their contribution.

Finally, the fifth requirement, "reasonably equivalent to the value or interest received" is also satisfied. Community One compares the $20,000 equity contribution to the total asset value in the case, $1.5 million. However, it is ignoring the fact that these assets are over encumbered and have no net asset value.  RTJJ is balance sheet insolvent by more than $2.5 million.  Thus, what is being purchased with $20,000 is nothing more than the right to control a small family business that has no net asset value. On these facts, the new value is substantial.

This takes us to Community One's market testing argument. Community One suggests that the new value contribution hasn't been exposed to the market for competitive bidding. For cases still within the §1121 exclusivity period, this would be a

---

[6] Henderson is willing to accept a partial, rather than a full, payment of his administrative expense claim.

problem. In *203 North LaSalle*, the Supreme Court found the absolute priority rule to be violated by a plan "provision for vesting equity in the reorganized business in the Debtor's partners without extending an opportunity to anyone else either to compete for that equity **or to propose a competing reorganization plan.**" (emphasis added). *Bank of Am. Nat. Trust and Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 436 (1999). Because "no one else could propose an alternative" plan, "the Debtor's partners necessarily enjoyed an exclusive opportunity that was in no economic sense distinguishable from the advantage of the exclusively entitled offeror or option holder." *Id.* at 455.

However, when exclusivity has expired and there is no option value to the right to propose a plan, the value of the property being retained should be determined based on normal valuation basis (i.e., the balance sheet of the reorganized debtor or by capitalizing its projected income). *In re Red Mountain Mach.*, 448 B.R. 1, 18 (Bankr. D. Ariz. 2011).

In our current case, exclusivity expired many months before the confirmation hearing was held. During this period, any party, including Community One, could have filed a competing plan that proposed a different ownership of the business. No one has done so, and apart from Community One, no one has suggested there is retained value in the Class A stock in excess of $20,000. Even Community One has offered no evidence to support such a valuation. Its objection is formulaic and obviously intended to block confirmation so that it may foreclose on the Properties.

This Plan meets the new value exception.

### 5.   The Plan is fair and equitable in the broad sense.

A plan "must literally be fair and equitable." *In re Manion*, 127 B.R. 887, 889 (Bankr. N.D.Fla. 1991). Thus, courts have denied confirmation to plans that are "one-sided rearrangement[s]" that impose "substantial" risks on the secured creditor while providing "significant benefits" to equity who accept "only minimal risks." And a plan proponent seeking cram down "must carry the burden of showing that the terms of the plan treat the dissenting classes fairly." *In re Grandfather Mountain Ltd. P'ship*, 207 B.R. 475, 487 (Bankr. M.D.N.C. 1996). Community One cites these cases in its brief, suggesting that RTJJ's Plan does not meet these standards. In point of fact, the opposite is true. Reorganization under the Second Amended Plan (as revised at hearing), is fair to all creditors. It is denial of confirmation and foreclosure that would be unfair and inequitable—to everyone, including Community One.

Reorganization offers benefits to all of RTJJ's creditors. The two partially secured creditors will derive the fair market value of their collateral, with interest. Unsecured creditors will receive a small distribution on their claims, but will also retain a customer and the prospect of future sales. RTJJ's employees will retain their jobs. Tenants will stay in their apartments. The Gastonia community will continue to enjoy low income housing provided by a reputable and lawful provider.

If confirmation is denied, relief from stay and foreclosure will follow. Unsecured creditors will receive nothing and some, like Simonds, will lose a good customer. RTJJ's employees will lose their jobs. Tenants are unlikely to remain in their apartments post foreclosure. Gastonia's housing concerns (loss of low income housing and an increase in

crime due to absentee landlords) will probably come to fruition. A reputable low-income housing source will be lost.

Even Community One and First National will be disadvantaged by foreclosure. As noted, their collateral is unique and generally unmarketable. The Properties are not presently suited for resale as residences. There are no identified buyers for these assets. There are no other landlords of this type in this market. In foreclosure, the two secured creditors are assured of a tremendous loss of value.

First National recognizes this. Community One does not seem to care. Under pressure from federal regulators, Community One seeks to rid itself of this nonperforming loan, at any cost. Its aims are noneconomic--at least as to this Debtor-- and are destructive. Reorganization is preferable.

With the minor amendments noted at hearing, the Second Amended Plan should be **Confirmed**.


### C. The Motion for Relief from Stay should be Denied.

Because the Plan is confirmed, Community One's motion for relief from stay is **Denied**. The Properties, the Debtor's primary operating assets and the source of the Debtor's future income, are necessary to success of the Plan per 11 U.S.C. §362(d)(2)(B).

**SO ORDERED.**

This Order has been signed electronically.         United States Bankruptcy Court
The judge's signature and the court's seal
appear at the top of the Order.